1  PETER R. BOUTIN, CASB No. 65261
   peter.boutin@kyl.com
2  GORDON C. YOUNG, CASB No. 158100
   gordon.young@kyl.com
3  KEESAL, YOUNG & LOGAN
   A Professional Corporation
4  Four Embarcadero Center, Suite 1500
   San Francisco, California 94111
5  Telephone:  (415) 398-6000
   Facsimile:  (415) 981-0136
6
   Attorneys for Plaintiff
7  PERSHING LLC

8
                    UNITED STATES DISTRICT COURT
9
                   NORTHERN DISTRICT OF CALIFORNIA
10

11 PERSHING LLC,                        ) Case No. cv-08-3141 WHA
                                        )
12                      Plaintiff,      ) **PLAINTIFF'S MEMORANDUM OF**
                                        ) **POINTS AND AUTHORITIES IN**
13              vs.                     ) **SUPPORT OF *EX PARTE***
                                        ) **APPLICATION FOR TEMPORARY**
14 CROCKER SECURITIES LLC and           ) **RESTRAINING ORDER, ORDER TO**
   DOUGLAS CHRISTOPHER GREEN,           ) **SHOW CAUSE RE PRELMINARY**
15                                      ) **INJUNCTION AND REQUEST FOR**
                        Defendants.     ) **EXPEDITED DISCOVERY [F.R.C.P.**
16                                      ) **65 AND 26]**
                                        )
17                                      )
                                        )
18 ─────────────────────────────────────)

19         Plaintiff PERSHING LLC ("Pershing") respectfully submits this

20 memorandum in support of its (1) *Ex Parte* Application for Temporary Restraining Order

21 and Order to Show Cause Re Preliminary Injunction pursuant to Fed. R. Civ. P. 65, and

22 (2) request for an Order granting Expedited Discovery pursuant to Fed. R. Civ. P. 26(d).

- 1 -

KYL_SF463558

MEMORANDUM OF POINTS AND AUTHORITIES FOR EX PARTE APPLICATION FOR TRO AND EXPEDITED
DISCOVERY -- Case No. cv-08-3141 WHA

## I. INTRODUCTION

This action arises out of a carefully orchestrated fraudulent scheme in which defendants Crocker Securities ("Crocker") and Douglas Green (collectively "Defendants"), in his capacity as an agent and registered representative of Crocker, systematically manipulated the price of securities trades Defendants reported to Pershing which acted as Crocker's clearing firm. Defendants' scheme was designed to enrich Defendants at the expense of Pershing. Between approximately February 2005 and May 2008, Defendants caused a series of fraudulent and fictitious trades to be placed in different fixed income instruments (primarily Mortgaged Backed Securities) ("MBS") for the purpose of artificially inflating the reported value of the securities and creating a false record of profitable trades when – in fact – no legitimate arms-length trades had occurred. Specifically, Defendants reported to Pershing a series of fraudulent buy and sell transactions involving at least five separate securities for the purpose of creating the appearance of legitimate trading activity when – in fact – the purported buys and sells involved no change in beneficial ownership. In each case, the transaction "sale price" reported to Pershing by Defendants was inflated over the true market value of the securities. These false profits were in turn used by Defendants as security for extensions of credit (totaling millions of dollars) provided by Pershing.

On Friday, June 27, 2008, Pershing discovered for the first time that the parties on the other side of the purported sale transactions reported by Defendants were completely unaware of the "sales" that had been reported by Defendants. Once the fraudulent sales were cancelled, Pershing discovered that the sale prices reported by Defendants were grossly inflated. As a result, Pershing will be left with a debit balance of more than $8 million that Crocker has indicated cannot be paid. Crocker has also indicated to Pershing that it intends to report a net capital deficiency to securities regulators. Pershing is faced with the imminent prospect of Crocker's insolvency.

Based upon the foregoing, Pershing has filed the instant Application

seeking a TRO preventing the diminution of Defendants' assets and an Order granting expedited discovery.

## II.    FACTUAL SUMMARY

### A.    Pershing's Discovery of Defendants' Fraudulent Scheme

Pershing is one of the largest securities clearing firms in the United States. Pershing executes, clears, settles and custodies securities on behalf of over 1100 introducing intermediaries. In the parlance of securities clearing, broker dealers that use the services of clearing firms are called "introducing firms" or "introducing intermediaries." Declaration of Samantha E. Kefford ("Kefford Decl.") ¶ 2. Crocker Securities is an introducing firm to and customer of Pershing. Crocker Securities has been a clearing customer of Pershing since in or about August 2003. Id. at ¶ 3.

In or about May, 2008, Pershing was advised by FINRA, the self-regulatory organization for securities firms, that it was conducting a routine examination of Crocker Securities. As a part of FINRA's examination, FINRA requested that Pershing provide trading information in the form of a document commonly referred to as a "trade blotter" concerning transactions in five mortgage-backed securities traded by Crocker between October 1, 2007 and March 31, 2008. Id. at ¶ 5.

Following receipt of this information request, Pershing's Compliance Department began collecting documentation and preparing a response to FINRA's request for information. Id. at ¶ 6. On or about June 3, 2008 and June 9, 2008, Pershing provided FINRA with documentation and information consisting of trade blotters for the relevant securities during the time period requested. Pershing also provided FINRA with "contra party" information (i.e. the identity of the entity or individual on the opposite side of the trade) for these transactions. Id. at ¶ 7.

On June 19, 2008, FINRA sent a request for documents to Pershing in connection with FINRA's investigation of Defendants. FINRA's request advised

Pershing that it had discovered a "discrepancy in the trade dates recorded by [Crocker]" and that it sought information and documentation concerning the trading of mortgage-backed securities in an account maintained by Crocker at Pershing. Id. at ¶ 8 and Exh. 1.

While providing a response to this request, Pershing also conducted an internal review of the current activity in Crocker's Proprietary Trading Account. The review revealed numerous open trades on mortgage-backed securities. Pershing senior management subsequently spoke with Kevin Martin, Crocker's principal, who confirmed that Defendant Douglas Green initiated the trades. Declaration of Theodore Bragg ("Bragg Decl.") at ¶ 9.

Pershing contacted the contra parties to these non-settled transactions and the contra parties disavowed any knowledge of the transactions and advised that they would not settle (or finalize) the trades. Kefford Decl. ¶ 10. As a result, Pershing has cancelled the non-settled transactions. Id.

### B. Pershing's Forensic Analysis of Defendants' Fraudulent Trading Activity

Upon discovery of the Defendants' fraudulent trading activity, Pershing's high level trading personnel analyzed Defendants' trading history and account transfers by reviewing Pershing's records from July 2003 through May 2008 detailing Crocker's Proprietary Trading Accounts. Bragg Decl. at ¶ 5.

The records demonstrate that defendant Green executed many transactions in Crocker's Proprietary Trading Account in the same five securities (the "Securities") over a period of several years. Id. at ¶ 6. The Securities are identified by the following CUSIP numbers: 31393YU37, 31394UT77, 313294VJD3, 31396GXN6 and 32051DK50. Id. The Securities can be generally described as MBS. Id. at ¶ 7. The MBS which Crocker traded in its proprietary account do not have a reportable market. Id. Accordingly, Pershing lists the purchase and sale prices of MBS in Crocker's account at

- 4 -

MEMORANDUM OF POINTS AND AUTHORITIES FOR EX PARTE APPLICATION FOR TRO AND EXPEDITED DISCOVERY -- Case No. cv-08-3141 WHA

KYL_SF463558

the price reported by Crocker to Pershing. Id.

Pershing's records show that starting at least as early as February 2005, and continuing until June 2008, the prices in Crocker's proprietary trading activity in the MBS generally rose through a pattern of systematic trading with a limited number of counterparties. Id. at ¶ 8. Crocker's trading activity includes a series of matched orders with no real change in beneficial ownership. Id. Consequently, the prices of all five of the Securities were increasingly inflated over the true market value of the Securities, thereby allowing Crocker to realize false profits. Id.

Pershing lent money in good faith through a margin account to Crocker to finance the purchases of the Securities. Bragg Decl. ¶ 10. As of June 27, 2008, Pershing was owed approximately $30 million in the form of a good faith margin loan extended by Pershing to Crocker. Id. Pershing began liquidation of the Securities and other collateral of Crocker on June 30, 2008. Id. Upon completion of the sale of the collateral, Pershing's loss is expected to exceed $8.6 million. Id.

### C. Examples of Defendants' Fraudulently Cancelled and Re-entered Trades

Perhaps the easiest way to explain Defendants' manipulative activity is by way of an illustrative transaction executed by Crocker. On trade date July 30, 2007 for settlement on July 31, 2007, Crocker purchased in its proprietary account $10 million par value of CUSIP Number 31394UT77 (the "UT77 Bonds") at a price of $115.8438 versus Saxony Securities, Inc. ("Saxony"). Bragg Decl. ¶ 11. The same day Crocker booked a sale of the UT77 Bonds for settlement date August 31, 2007, at a price of 115.96875 versus First Southwest Company for the account of National Alliance Securities Corp. ("NAS"). Id. In reality, this sale was a fictitious trade and Crocker did not, in fact, enter into a bona fide trade with NAS. Id.

On August 27, 2007, prior to the expected settlement, Crocker cancelled

- 5 -

MEMORANDUM OF POINTS AND AUTHORITIES FOR EX PARTE APPLICATION FOR TRO AND EXPEDITED DISCOVERY -- Case No. cv-08-3141 WHA

KYL_SF463558

the trade versus NAS and booked a new sale of the UT77 Bonds as of July 30, 2007 at a price of 115.96875 with a settlement date of August 31, 2007, versus a new counterparty, Saxony. Id. Saxony is an introducing broker-dealer to Pershing. On August 30, 2007, Crocker purchased the UT77 Bonds again at a price of 116.00 from Saxony to start the cycle again. Id. at ¶ 11 and Exh. "D." The UT77 Bonds are a fixed income agency security. Id. The price of the UT77 Bonds fluctuates in relation to interest rates. Id. The price should go up when interest rates go down; however, it is a feature of this MBS that its price should cap out under current mark conditions. Id. The price of the MBS should not rise. Id. Thus, basic economics indicate that the price of the MBS is significantly out of line with the market. Id. In fact, the current price of this MBS as of June 30, 2008 was in the mid-80s, but the last price at which Crocker allegedly traded this security on May 29, 2008 is 132.84375. Id.

The manipulation effectuated in this transaction is consistent with the basic pattern employed by Crocker. Id. at ¶ 12. Crocker bought the Securities and simultaneously or nearly simultaneously booked a fictitious sale of the Securities for an extended settlement (generally 30-35 days) to one counterparty at an inflated price, then cancelled the trade to this counterparty just before settlement knowing that it would not settle, and sold briefly to another party at a higher price (apparently with an agreement to simultaneously buy the position back at an even higher price which re-established Crocker's position in the UT77 Bonds and started the cycle of manipulation again). Id. Crocker engaged in similar manipulative transactions for at least the last three years. Id.[1]

### D. Pershing Has Suffered and Will Suffer Significant Economic Harm As a Result of Defendants' Fraudulent Scheme

The manipulation scheme described above allowed Crocker to fraudulently

---

[1] Another example of Crocker's manipulative activity is set forth in the Bragg Decl. at ¶ 13 and the related exhibits referred to therein.

- 6 -

MEMORANDUM OF POINTS AND AUTHORITIES FOR EX PARTE APPLICATION FOR TRO AND EXPEDITED DISCOVERY -- Case No. cv-08-3141 WHA

KYL_SF463558

withdraw millions of dollars from the Proprietary Trading Account – funds to which Crocker was not entitled. Declaration of Edward Banian ("Banian Decl.") ¶ 4. The fraudulent credits were effectuated in at least two different ways.

  ***First***, Pershing's records reflect that Pershing, not Crocker, paid for the securities at the time they were initially purchased by Crocker. Id. at ¶ 5. The monthly statements for the Proprietary Trading Account reflect that when Crocker submitted the initial purchase orders for the Securities and then sold them to the contra broker, Pershing credited the position to the Proprietary Trading Account and transferred payment to the seller on settlement date. Id. Crocker's manipulative trading scheme caused the repeated extension of the settlement dates of Crocker's transactions in the Securities, and caused Pershing to finance those positions, until the scheme was discovered by Pershing on June 27, 2008. Id.

  ***Second***, each time Crocker sold the Securities, the manufactured "profit" was booked to the Proprietary Trading Account as a trade-date credit. Id. at ¶ 6. These funds were made available to Crocker on trade date, and Crocker would then transfer these artificial profits out of the Proprietary Trading Account to the detriment of Pershing. Id.

  Over time, the margin debit in the Proprietary Trading Account grew to more than $30,000,000. Id. at ¶ 7 and Bragg Decl. Exh. A. At the opening on June 30, 2008, the Securities in the Proprietary Trading Account had a combined value of approximately $21,629,950. Id. at ¶ 7. Since December 14, 2005, Crocker has transferred approximately $11,435,000 out of its Proprietary Trading Account, to a bank account in Crocker's name at Bank of America. Id. As a consequence of Defendants' manipulative activity, Pershing will suffer losses of over $8.6 million based on true market prices as of June 30, 2008. Bragg Decl. ¶15.

  Crocker informed Pershing personnel that it intended to advise FINRA of Crocker's anticipated net capital deficiency. Declaration of Scott Munroe ("Munroe

Decl.") at ¶ 6. Crocker's principal, Kevin Martin, volunteered that he expected Crocker would "go out of business soon." Id.

## III. LEGAL ANALYSIS

### A. The TRO and Preliminary Injunction Standard

In determining whether to issue a TRO or preliminary injunction, federal courts in California require the moving party to make a clear showing of either: (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party. These standards "are not separate tests but the outer reaches of a single continuum." Stuhlberg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839-40 (9th Cir. 2001); California Native Plant Society v. United States E.P.A., 2007 WL 2021796, at *13 (N.D. Cal. July 10, 2007). Accord Roe v. Anderson, 134 F.3d 1400, 1402 (9th Cir. 1998) ("These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.").

### B. Pershing Has Satisfied The Injunction Standard

#### 1. Pershing Is Likely To Prevail On The Merits And There Is A Possibility Of Irreparable Harm

Pershing respectfully submits that it is entitled to a temporary restraining order and a preliminary injunction restraining Defendants from dissipating their assets pursuant to Federal Rule of Civil Procedure 65. The Declarations submitted in support of this Application demonstrate that Defendants have engaged in a fraudulent scheme characterized by fictitious sales of MBS designed to mislead Pershing into extending millions of dollars credit to Crocker. Defendants have systematically removed from their Proprietary Trading Account the funds Pershing credited to Crocker in connection with the fraudulent securities transactions. Now that Pershing has
- 8 -
KYL_SF463558

1 | unearthed the Defendants' wrongdoing, Pershing is left with a debit balance of more
2 | than $8.6 million.  Defendants' conduct constitutes fraud, is in breach of the Clearing
3 | Agreement and is in violation of Rule 10b-5 promulgated under the Securities Exchange
4 | Act (15 U.S.C. § 78j(b)).

5 |       Pershing is entitled to an injunction even though its harm in compensable
6 | by monetary damages.  "A judgment-proof defendant is not deterred by the threat of
7 | money damages, so some other remedy (such as the contempt power) may be essential."
8 | Lakeview Technology Inc. v. Robinson,  446 F. 3d 655, 657 (7th Cir. 2006.)  Here, unless
9 | the court issues a restraining order and injunction prohibiting defendants from
10 | dissipating their assets, Defendants will not be deterred by the threat of monetary
11 | damages.  As noted in the Munroe Decl. at ¶ 4-6, Crocker has already indicated that it
12 | intends to report a net capital deficiency to FINRA and, as a result, it is likely that
13 | Crocker will go out of business.  Accordingly, Pershing needs this court's contempt power
14 | to ensure that it will have assets available to satisfy its judgment.

15 |       Although Pershing is seeking both money damages and equitable relief,
16 | this "does not defeat the district court's equitable powers." United States ex rel.
17 | Rahman v. Oncology Assocs., P.C., 198 F.3d 489, 501 (4th Cir. 1999).  The great weight
18 | of authority holds that preliminary relief is available on an equitable claim to preserve
19 | defendants' assets.  Deckert v. Independence Shares Corp., 311 U.S. 282, 290, 61 S.Ct.
20 | 229, 85 L.Ed. 189 (1940), Federal Trade Commission v. H.N. Singer, Inc., 668 F.2d 1107,
21 | 1112 (9th Cir. 1982).  Reebok Int'l Ltd. v. Marnatech Enterprises, Inc., 737 F. Supp.
22 | 1521, 1525 (S.D. Cal. 1990).

23 |       In addition, the Supreme Court has held that equitable remedies employed
24 | to preserve the status quo are proper in actions arising under the securities laws.
25 | Deckert, 311 U.S. at 287-288, ("[T]he [Securities] Act as a whole indicates an intention to
26 | establish a statutory right which the litigant may enforce in designated courts by such
27 | legal or equitable actions or procedures as would normally be available to him.")  The
28 |

- 9 -

KYL_SF463558

MEMORANDUM OF POINTS AND AUTHORITIES FOR EX PARTE APPLICATION FOR TRO AND EXPEDITED DISCOVERY -- Case No. cv-08-3141 WHA

Supreme Court further held that an injunction is a reasonable measure to "preserve the status quo pending final determination of the questions raised." Id. at 290. Pershing respectfully requests that the Court grant a TRO and a preliminary injunction in order to preserve its potential legal remedy.

### 2. Serious Questions Are Raised And The Balance Of Hardships Tips Strongly In Favor Of Pershing

Pershing also satisfies the alternative test on the continuum for granting injunctive relief — serious questions are raised, and the balance of hardships tips strongly in its favor. Pershing seeks only to maintain the *status quo* of Defendants' assets pending a final decision on the merits. The benefit of such injunctive relief to Pershing will vastly outweigh any minimal detriment to Defendants.

"Serious questions" means questions that involve a fair chance of success on the merits that cannot be resolved one way or the other at the hearing on the injunction, "and as to which the court perceives the need to preserve the status quo lest one side prevent resolution of the question or execution of any judgment by altering the status quo." Republic of the Philippines v. Marcos, 862 F. 2d 1355, 1362 (9th Cir. 1988) Schwarzer, Tashima and Wagstaffe, Cal Practice Guide: Fed. Civ. Pro. Before Trial (TRG 2008) ¶13:45.1 at p. 13-18.

As set forth in the concurrently filed Declarations of Mr. Banian, Mr. Bragg, Mr. Munroe and Ms. Kefford, serious questions exist as to the extent and nature of Defendants' fraudulent scheme and the potential participants therein. In order to maintain the status quo, Pershing requires a TRO and Preliminary Injunction to prevent Defendants from dissipating their assets in advance of the ultimate decision on the merits.

The balance of hardships tips strongly in favor of Pershing. An order enjoining Defendants from dissipating their assets does not deprive them of ownership of these assets. By contrast, with each passing day Pershing runs the risk that the assets

to which it is entitled will disappear. This risk is further compounded by Defendants' precarious financial condition.

### C. Pershing is Entitled to Expedited Discovery

Pershing further requests that the Court allow it to conduct expedited discovery so that Pershing may discover, prior to the date set for the OSC hearing, the nature and extent of Defendants' fraudulent trading activity, and the degree to which Defendants have misappropriated Pershing's assets. Specifically, Pershing requests that it be permitted to serve deposition notices on an expedited basis, including a specification of materials to be produced by the deponent, pursuant to Fed. R. Civ. P. 26(d). Although the Federal Rules of Civil Procedure generally prohibit a party from seeking discovery before the parties have conferred, Rule 34(b)(2)(A) provides this Court with authority to grant expedited discovery when preliminary injunctions are pending. See also, Ellsworth Assocs. v. United States, 917 F. Supp. 814, 844 (D.D.C. 1996) (Court granted plaintiff's request for expedited discovery because it would expedite resolution of their claims for injunctive relief.)

Here, Pershing needs expedited discovery to determine the full scope of the fraudulent scheme perpetrated by Defendants. Pershing also needs immediate discovery so that it can trace the millions of dollars Defendants fraudulently induced Pershing to allow Defendants to withdraw from the Proprietary Trading Account.

///
///
///

MEMORANDUM OF POINTS AND AUTHORITIES FOR EX PARTE APPLICATION FOR TRO AND EXPEDITED DISCOVERY -- Case No. cv-08-3141 WHA

KYL_SF463558

## V. CONCLUSION

For the reasons set forth above, Pershing respectfully requests the Court to grant Pershing's *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction. Further, Pershing requests that an order for expedited discovery be granted.

DATED: July 1, 2008

_____
PETER R. BOUTIN
GORDON C. YOUNG
KEESAL, YOUNG & LOGAN
ATTORNEYS FOR PLAINTIFF
PERSHING LLC

KYL_SF463558

MEMORANDUM OF POINTS AND AUTHORITIES FOR EX PARTE APPLICATION FOR TRO AND EXPEDITED DISCOVERY -- Case No. cv-08-3141 WHA